## Office of Disciplinary Counsel v. Atlas

Disciplinary Board Docket no. 171 D.B. 2001.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

RUDNITSKY, *Member,* March 24, 2004—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On December 21, 2001, petitioner, Office of Disciplinary Counsel, filed a petition for discipline against respondent, Joan Gaughan Atlas. The petition contained three charges alleging that respondent committed professional misconduct by converting and commingling fiduciary funds, making misrepresentations, and engaging in a series of false certifications on her Pennsylvania Attorney Annual Fee forms. Respondent filed an answer to petition for discipline on February 11, 2002.

Disciplinary hearings were held on July 16, 2002 and October 7, 2002, before Hearing Committee 1.20 comprised of Chair Leigh Michael Skipper, Esquire, Member Kelley A. Grady, Esquire, and Alternate Member Harold Mark Goldner, Esquire. Respondent was represented by Stuart L. Haimowitz, Esquire.

Following briefing by the parties, the Hearing Committee filed a report on July 16, 2003, recommending that respondent be suspended for a period of three years.

Petitioner filed a brief on exceptions on July 31, 2003. No exceptions were filed by respondent.

This matter was adjudicated by the Disciplinary Board at the meeting of November 19, 2003.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, PA 17101, is invested, pursuant to the Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and

to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

(2) Respondent was born in 1952 and was admitted to practice law in the Commonwealth of Pennsylvania in 1981. She maintains an office at 1500 Walnut Street, Suite 1500, Philadelphia, PA 19102. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania.

(3) Respondent has no prior history of discipline.

*Charge I—The Beum Matter*

(4) On June 25, 1990, Donna Beum was injured at the Belair Shopping Center in Philadelphia.

(5) Ms. Beum and her husband retained Michael S. Durst, Esquire, to represent them in a premises liability action arising from Ms. Beum's injuries.

(6) Ms. Beum signed a contingency fee agreement providing that Mozenter, Mozenter & Durst would reserve 40 percent of any verdict or settlement after reimbursement of costs.

(7) On July 22, 1991, the Beums filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Middle District of Louisiana; the petition listed the third-party claim as an asset of the bankruptcy estate.

(8) On June 18, 1992, Mr. Durst filed a civil action on the Beums' behalf.

(9) On December 29, 1993, one of the defendants filed a suggestion of bankruptcy, and the Beum action was stayed.

(10) On November 25, 1994, Nicholas M. Fausto, Esquire, filed his entry of appearance on behalf of the Beums and Mr. Durst withdrew his appearance.

(11) Mr. Fausto subsequently referred the Beum case to respondent.

(12) On January 19, 1995, respondent entered into an employment agreement with Ostroff & Kline P.C.

(13) On May 15, 1995, respondent entered the appearance of Jonathan Ostroff as counsel for Ms. Beum.

(14) During respondent's employment with the Ostroff firm, respondent used the support services of the firm and $2,051.96 in firm funds in connection with the Beum action.

(15) On August 18, 1995, respondent left the employ of the Ostroff firm.

(16) After leaving the firm, respondent continued to represent Ms. Beum. A dispute arose between respondent and the Ostroff firm over the firm's entitlement to a portion of the fee and reimbursement of its costs.

(17) Respondent and the Ostroff firm submitted the dispute to binding arbitration, as required by respondent's employment agreement.

(18) By letter dated July 7, 1995, Samera L. Abide, Esquire, the trustee in the Beum's bankruptcy, informed respondent that:

"(a) Ms. Beum's civil cause of action was property of the bankruptcy estate;

"(b) In order for respondent to continue as counsel in the civil action, it would be necessary for Ms. Abide to seek approval of respondent's employment from the bankruptcy court;

"(c) Once approved, the bankruptcy estate, represented by Ms. Abide, would be respondent's client, not the debtors;

"(d) All offers of settlement would have to be communicated to Ms. Abide for evaluation and would be subject to bankruptcy court approval; and

"(e) Payment of attorney's fees and reimbursement of costs would require bankruptcy court approval."

(19) By letter dated July 26, 1995, respondent provided to Ms. Abide a history of the Beum action and its current status.

(20) On November 7, 1995, Ms. Abide filed with the bankruptcy court an application to employ respondent as special counsel.

(21) At or about that time, respondent commenced employment with Albert L. Deutsch Associates in Philadelphia.

(22) By letter dated November 3, 1995, respondent notified Ms. Abide of respondent's new mailing address and informed Ms. Abide that the Beum action had been discussed by counsel and a settlement master on October 31, 1995.

(23) By order dated November 14 and filed November 15, 1995, the bankruptcy court approved Ms. Abide's application to have respondent appointed as special counsel to the bankruptcy estate.

(24) Prior to the scheduled arbitration between respondent and the Ostroff firm, respondent and the firm reached an agreement dated May 30, 1996, wherein respondent agreed that, with respect to the Beum action, she would pay to the Ostroff firm one-third of the net fees received by respondent.

(25) By letter dated August 19, 1996, respondent requested that Ms. Abide send all future correspondence to respondent's home address and notified her that the defendant in the Beum action had offered $425,000 in

settlement of Ms. Beum's claims and that there was a workers' compensation lien in the amount of $182,078.34 as of August 1, 1996.

(26) On August 30, 1996, Ms. Abide filed a motion for authority to compromise and settle litigation and to pay workers' compensation lien, therein notifying the bankruptcy court that the defendant had tendered a check in the amount of $425,000, which was "in hand" and requesting that the bankruptcy court approve a settlement in that amount.

(27) On August 30, 1996, Ms. Abide also filed a fee application requesting that the bankruptcy court approve respondent's fee as special counsel to the trustee in the amount of $170,000 and reimbursement of expenses in the amount of $8,250.68 for a total disbursement of $178,250.68.

(28) Attached to the fee application was an itemized expense statement, which included some expenses that had been advanced by the Ostroff firm, such as travel to New Orleans to take depositions.

(29) By orders docketed October 1, 1996, the bankruptcy court approved both applications.

(30) By letter of October 9, 1996, to respondent and Ms. Abide, Thomas DeLorenzo, Esquire, counsel for defendant Belair, informed respondent that he wanted to order the settlement draft from the carrier and wanted to know to whom the check should be made payable.

(31) After receiving responses from respondent and Ms. Abide, Mr. DeLorenzo, on December 10, 1996, forwarded to Ms. Abide a settlement check in the amount of $425,000.

(32) On December 18, 1996, Ms. Abide deposited the settlement check.

(33) On January 6, 1997, Ms. Abide issued to respondent two checks. Check no. 101 was made payable to respondent in the amount of $178,250.68 and check no. 102 was made payable to respondent in trust for the State Workers' Coinsurance Fund in the amount of $184,426.79.

(34) On January 8, 1997, respondent deposited check no. 102 into her PNC Bank escrow account. She deposited check no. 101 into the Mellon PSFS Bank account, in the name of Joan M. Atlas, which respondent identified on the back of the check as an "atty. acct."

(35) Check no. 101 comprised fiduciary funds in that Attorneys Nicholas Fausto and Jonathan Ostroff had an interest in the funds.

(36) Respondent failed to deposit that portion of the funds belonging to the Ostroff firm into a trust account.

(37) Respondent failed to promptly notify the Ostroff firm of her receipt of the funds.

(38) On January 13, 1997, respondent wrote check no. 1017 on her account at Mellon in the amount of $94,499.35 and payable to "Joan Atlas escrow account." She deposited this check into the PNC escrow account.

(39) On January 17, 1997, respondent wrote check no. 1004 on the PNC escrow account in the amount of $56,666.67 payable to Nicholas Fausto in payment of Mr. Fausto's referral fee in the Beum matter.

(40) As of January 17, 1997, respondent was entrusted with approximately $35,500 belonging to the Ostroff firm.

(41) From March 3, 1997 until the time of the disciplinary hearing, respondent failed to hold approximately $35,500 in trust for the benefit of the Ostroff firm.

(42) When a dispute arose over compliance with the terms set forth in the settlement agreement, the Ostroff firm reinitiated the binding arbitration process.

(43) By award of the arbitrator dated August 7, 1997, it was determined that in the Beum action, the fees generated were to be calculated and distributed in the relevant following order of priority, that being Nicholas Fausto, then the Ostroff firm, then respondent.

(44) By letter dated May 28, 1998 to Mr. Ostroff, respondent misled Mr. Ostroff into believing that she had not yet received any distribution from the bankruptcy court.

(45) In the letter of May 28, 1998, respondent misrepresented to Mr. Ostroff that the final approval of all distributions and fees would be completed by October 1998.

(46) At all relevant times, Mr. Ostroff or his successor firm had a legally cognizable interest in the fee portion of the Beum settlement funds based upon the employment agreement, the May 30, 1996 settlement agreement, the award of the arbitrators, and respondent's contractual obligation as set forth in her letter of May 28, 1998 to Mr. Ostroff.

*Charge II—Mishandling of Fiduciary Funds*

(47) From at least September 10, 1996 to April 13, 1998, respondent maintained an account at PNC Bank captioned "Joan M. Gaughan Atlas escrow account."

(48) From at least September 7, 1996 to July 7, 2000, respondent maintained an account at Mellon PSFS Bank captioned "Joan M. Atlas." This account was a non-fiduciary account.

(49) Respondent made disbursements from her PNC escrow account in payment of her personal expenses, debts and obligations.

(50) Respondent wrote checks on her PNC escrow account payable to cash without identifying the basis for the disbursement.

(51) On or about April 17, 1997, respondent endorsed a check from the City of Philadelphia payable to Robert and Constance McKenna and Ostroff & Kline P.C., in the amount of $9,333 and deposited the check into the PNC escrow account.

(52) On or about December 19, 1997, respondent commingled personal and fiduciary funds in the PNC escrow account by depositing personal funds into that account.

(53) Respondent commingled personal and fiduciary funds in her non-fiduciary account at Mellon.

(54) On September 18, 1996, respondent deposited into her Mellon account a check payable to Albert L. Deutsch Associates in the amount of $1,050 and bearing the notation "legal retainer."

(55) On October 19, 1996, respondent wrote a check on her non-fiduciary account at Mellon, payable to Jerome and Gloria White in the amount of $5,000 and bearing the notation "*White v. City* settlement proceeds."

(56) On January 22, 1997, respondent wrote a check on her non-fiduciary account at Mellon, payable to John Della Polla, in the amount of $1,666.66 in connection with the Stephens case.

(57) On January 24, 1997, respondent wrote a check on the Mellon account payable to William Brennan in the amount of $888.88 in payment of the balance of the Scrullio referral fee.

(58) On March 27, 1998, respondent deposited into her non-fiduciary account at Mellon a cashier's check payable to Regina Coyne in the amount of $16,040; and

a cashier's check in the amount of $21,550 payable to Regina Coyne.

(59) Respondent failed to hold entrusted funds belonging to Ms. Coyne separate from respondent's personal funds.

(60) On March 30, 1998, respondent wrote a check on her non-fiduciary account at Mellon payable to Elizabeth Bosley in the amount of $12,974.60 and bearing the notation "A Baines case proceeds."

(61) On May 6, 1998, respondent wrote two checks on her non-fiduciary account at Mellon. One was payable to Louis Mercer in the amount of $2,498.57 and bearing the notation "Proceeds of settlement—final." The second check was payable to "Bureau of accounts—CCP Phila. Family Div." in the amount of $8,000 and bearing the notation "Louis Mercer case distribution."

(62) On December 1, 1998, respondent deposited into her non-fiduciary account at Mellon MetLife a check payable to Frank Giunta and Attorney Joan G. Atlas in the amount of $7,500 and bearing the notation "Settlement."

(63) On January 23, 1999, respondent wrote a check on her non-fiduciary account at Mellon payable to Bernadette Wilkinson in the amount of $4,778.36 and bearing the notation "*Wilkinson v. DePace* case proceeds."

(64) Respondent maintained funds of clients in connection with their representation in her Mellon account and allowed the account balance to fall below that of the entrusted funds.

(65) From December 2, 1996 through December 8, 1997, respondent was entrusted with $3,012.10 in connection with her representation of clients in the Mulero/

Feliciano matter. During that time period, the balance in respondent's account fell below $3,012 on 58 occasions.

(66) From December 1, 1998 through May 10, 2000, respondent was entrusted with $4,000 belonging to her client Frank Giunta. During that period, the balance in the account fell below $4,000 on 133 dates.

(67) During the period from March 1997 until the present, respondent did not maintain complete and accurate records of her transactions involving fiduciary funds.

(68) Respondent did not maintain in trust sufficient funds to cover all of her obligations to Jonathan Ostroff and the Ostroff firm or its successors.

(69) Respondent utilized fiduciary funds for her own benefit.

(70) Respondent's explanation for why she did not hold client funds in trust was that she was not paying attention and was engaged in "emergency living." (N.T. 419.) She also made reference to sloppy bookkeeping. (N.T. 418.)

(71) Respondent accepted employment with the Ostroff firm because she needed the income and health insurance. (N.T. 375.)

(72) When respondent informed Mr. Ostroff that she was leaving the firm and he raised her obligations under the employment agreement, respondent told Mr. Ostroff, "I really think it's onerous that you want 60 percent of the cases that I brought with me as well as the ones that I generated while I was here." (N.T. 383.)

(73) Respondent's explanation for failing to tell Mr. Ostroff that she had received the fees in the Beum case was because she was in deep debt and about to lose her house. (N.T. 391.)

(74) Respondent promptly paid Nicholas Fausto his referral fee in the Beum case because "there was no question in her mind that he was entitled to a full fee" and "in terms of friends, family, social connections, et cetera, Nick [Fausto] was very involved in [her] life on a day-to-day basis . . . ." (N.T. 396.)

(75) Respondent further explained her decision not to pay Mr. Ostroff at the time she received the Beum fee:

"Where John was concerned, it seemed to me that I . . . well, first of all, he didn't do anything in the case himself. He entered his appearance because he insisted on doing so, which he was entitled as my employer to do, but he didn't do any actual work. It seemed to me that John, you know, wanted a big portion of the fee without regard to work performed or his involvement in the case. And, you know maybe he was entitled to it. I just know at the time that—and this is before I was in treatment and before I was looking at things, I was angry with the guy. I just felt that he had overreached. I felt that, you know, he like became the focus of that anger." (N.T. 446-47.)

(76) Respondent has not paid Mr. Ostroff any of the funds owed to him.

(77) On January 21, 1999, Donald F. Manchel and Marvin Lundy, respondent's former employers, filed a complaint in civil action against respondent in the Court of Common Pleas of Philadelphia County alleging that respondent had defaulted under the terms of a withdrawal and termination agreement. The complaint sought judgment in the amount of $319,481.80.

(78) In her answer and new matter to the complaint, respondent asserted that she had filed a Chapter 7 bankruptcy petition which discharged any and all debt owed to the plaintiffs and asserted that she had paid in excess

of $200,000 to plaintiffs since the inception of the withdrawal and termination agreement. Respondent believes that she may owe Mr. Manchel and Mr. Lundy an additional $50,000.

(79) Respondent executed an assignment with Mr. Ostroff on August 6, 1999, by which she transferred "all rights, interest and privileges, which [respondent] has in the fees of the [six] cases" identified therein "until [Mr. Ostroff] receives payment of $33,466."

(80) In the assignment, respondent further agreed that "if the assigned fees from the [six] cases . . . do not result in a full payment of the $33,466" she would "assign [her] entitlement to [her] fees in as many additional cases as necessary until such time as [Mr. Ostroff] receives the $33,466 payment."

(81) Of the six cases that were the subject of the assignment, respondent testified that one had been withdrawn, two had been tried and lost, one was scheduled for trial in November 2002, one she could not remember, and the last had been settled but she did not think she received any funds in the case. (N.T. 454-62.)

*Charge III—False Certifications on Annual Fee Forms*

(82) On respondent's 1997-1998 Pa. Attorney's Annual Fee form dated June 9, 1997, and filed by the Administrative Office of the Disciplinary Board on August 7, 1997, respondent represented that between May 1, 1996 and May 1997, she or her law firm held funds of a client or third person subject to R.P.C. 1.15 in one account, that being at Regent National Bank.

(83) Respondent further represented that she was familiar and in compliance with R.P.C. 1.15 regarding the

handling of funds of clients and others, and certified that the information provided was true.

(84) Respondent's representations and certification were not true, as she held funds subject to R.P.C. 1.15 in other bank accounts.

(85) Respondent made similar false certifications on her Pa. Attorney Annual Fee forms for the years 1998-1999, 1999-2000, and 2000-2001.

### Braun Testimony

(86) Respondent presented the expert testimony of Dr. Richard Limoges. Respondent has treated with Dr. Limoges for alcoholism and depression since June 2000.

(87) Dr. Limoges opined that respondent's misconduct was causally related to her alcoholism and depression. (N.T. 291.)

(88) Dr. Limoges' knowledge of respondent's misconduct was incomplete.

(89) Dr. Limoges was not aware that as late as February 2002, respondent was refusing to admit that she failed to deposit the funds belonging to the Ostroff firm into a trust account, she failed to promptly notify the Ostroff firm of her receipt of the Beum funds, and that her letter of May 28, 1998, to Mr. Ostroff was deceptive.

### III. CONCLUSIONS OF LAW

By her actions as set forth above, respondent violated the following Rules of Professional Conduct and Rule of Disciplinary Enforcement:

(1) R.P.C. 1.15(a)—A lawyer shall hold property of a client or third person that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

(2) R.P.C. 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. A lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive, and upon request by the client or third person, shall promptly render a full accounting regarding such property.

(3) R.P.C. 1.15(c)—When in the course of a representation a lawyer is in possession of property in which both the lawyer and another person claim interest, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

(4) R.P.C. 8.4(b)—It is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

(5) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

(6) Pa.R.D.E. 203(b)(3)—Willful violation of any other provision of the Rules of Disciplinary Enforcement shall be a ground for discipline, via Pa.R.D.E. 219(d)(1)(iii), which provides that all persons who are required to pay an annual fee shall file a signed statement with the Administrative Office of Pennsylvania Courts listing the name of each financial institution in this Commonwealth in which the attorney on May 1 of the current year or at any time during the preceding 12 months held funds of a client or third person subject to

Rule 1.15 of the Pennsylvania Rules of Professional Conduct, and the name and account number for each account in which the lawyer holds such funds.

## IV. DISCUSSION

This matter is before the Disciplinary Board on a petition for discipline charging respondent with violating Rules of Professional Conduct 1.15(a), 1.15(b), 1.15(c), 8.4(b), 8.4(c) and Pa.R.D.E. 203(b)(3). The petition contains three charges alleging that beginning in March 1997 and continuing over 44 months, respondent committed serious professional misconduct by converting and commingling fiduciary funds, misrepresenting her receipt of fiduciary funds, and engaging in a series of false certifications on her attorney annual fee forms.

Petitioner has the burden of proving, by a preponderance of the evidence, that respondent's actions constitute professional misconduct. This burden must be established by clear and satisfactory evidence. *Office of Disciplinary Counsel v. Surrick,* 561 Pa. 167, 749 A.2d 441 (2000). The record demonstrates that petitioner met this burden of proof.

Respondent entered into joint stipulations of law and fact wherein she admitted that she engaged in professional misconduct constituting misappropriation of approximately $35,000 in fiduciary funds, misrepresentation to third parties and repeated mishandling of fiduciary funds belonging to clients. She further made a series of false certifications on four of her annual attorney fee forms as to her compliance with R.P.C. 1.15. In the stipulations, respondent admitted to violating all of the rules charged in the petition for discipline with the exception of R.P.C. 8.4(b).

There is no question that respondent has engaged in serious professional misconduct. By knowingly and intentionally misappropriating $35,000 in fiduciary funds belonging to Attorney Ostroff, respondent has violated R.P.C. 8.4(b), which provides that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. Respondent's actions constitute the criminal act of theft.

Respondent contends that due to her alcoholism and depression she is entitled to mitigation pursuant to *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989). In order for a psychiatric infirmity to be considered in mitigation in a disciplinary proceeding, respondent must establish by clear and convincing evidence that the disorder was a causal factor in producing the misconduct. *Braun,* 520 Pa. at 160, 553 A.2d at 895.

Respondent presented the testimony of her treating psychiatrist, Dr. Richard Limoges. Respondent has been under the care of Dr. Limoges for more than two years. Her initial diagnosis was a chemical dependency on addiction, along with a long-standing depression. Respondent's treatment has consisted of a course of psychotherapy and involvement with Alcoholics Anonymous. From all accounts her progress in AA has been extremely satisfactory. She is also involved in Lawyers Concerned for Lawyers and is highly thought of in that organization and has shown progress in her sobriety.

Dr. Limoges found that respondent's misconduct was causally related to her alcoholism and depression. However, Dr. Limoges' testimony revealed an incomplete understanding of respondent's misconduct. He was not provided with respondent's answer to petition for disci-

pline and consequently did not know that as of February 2002, respondent was refusing to admit that she failed to deposit funds belonging to the Ostroff firm into a trust account, she did not promptly notify the Ostroff firm of her receipt of the Beum funds, and that her May 28, 1998 letter to Jonathan Ostroff was not truthful.

Case law that has developed since *Braun* is clear that respondent's expert must do more than state an opinion that a causal connection exists between the misconduct and the psychiatric condition. *In re Anonymous No. 66 D.B. 96,* no. 384 disciplinary docket no. 3 (Pa. Feb. 10, 1998). When analyzing expert testimony in a *Braun* matter it is appropriate to consider whether the expert is fully aware of the extent of respondent's misconduct and has analyzed the psychiatric condition in light of that particular misconduct. The board finds that Dr. Limoges was not aware of the full extent of respondent's misconduct, and his incomplete awareness of aspects of the misconduct weakens his testimony regarding a causal connection between respondent's alcoholism and depression and her misappropriation of funds.

The board concludes that, although respondent proved that she has a psychiatric condition, she did not meet her burden of proving that such condition substantially caused her misconduct.

Respondent's own testimony is forthcoming on the subject of her misconduct. She testified that she promptly paid referring Attorney Nicholas Fausto his share of the Beum funds because there was no question in her mind that he was entitled to a full fee and, furthermore, that Nicholas Fausto was a friend. As far as Jonathan Ostroff was concerned, respondent made clear her feelings that since she believed he had not done anything substantial

in the Beum case, he was not entitled to a large portion of the fee. Respondent felt that he was overreaching. Respondent admitted her anger towards Mr. Ostroff, which anger caused her to fail to make any restitution. This anger, more than any psychiatric condition, explains respondent's misconduct. Respondent appears to have selectively chosen not to fulfill or perhaps even recognize her obligation to the Ostroff firm.

Respondent's multiple violations of her professional duties warrant public discipline. Although there is no per se measure of discipline, the mishandling of funds is determinatively held to be a serious offense. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). Here the most egregious breach of trust was directed not at clients but at respondent's former law firm. While this fact spares harm to the public, the mishandling of non-client funds remains a serious offense.

The Hearing Committee recommended a three-year period of suspension. The committee did not recommend probation, although respondent urged consideration of probation as part of the sanction. Petitioner argued for disbarment. After review of the record, including the Hearing Committee's thorough report, the board is persuaded that a three-year suspension without probation is appropriate. Generally, attorneys who receive probation have established that their misconduct was caused by a psychiatric disorder, pursuant to *Braun.* Respondent failed to establish such a connection. Furthermore, respondent has made no restitution of funds as of this date, so should not be rewarded with a speedier return to practice than is warranted by her behavior. The only mitigating factors of record are her lack of a prior record of discipline and her serious efforts at achieving and main-

168

taining sobriety. The board is convinced that three years will suffice to instill in respondent a more complete understanding of her wrongdoing and a renewed awareness of her professional responsibilities.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, Joan Gaughan Atlas, be suspended from the practice of law for a period of three years.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Newman dissented and would recommend a five-year suspension.

## ORDER

And now, June 29, 2004, upon consideration of the report and recommendations of the Disciplinary Board dated March 24, 2004, it is hereby ordered that Joan Gaughan Atlas be and she is suspended from the practice of law in the Commonwealth of Pennsylvania for a period of three years and she shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.